UNITED FUEL GAS CO. v. COLUMBIAN
FUEL CORPORATION.

SAME v. UNITED CARBON CO.

Nos. 5661, 5662.

Circuit Court of Appeals, Fourth Circuit.

Jan. 5, 1948.

Charles C. Wise and Bernard J. Pettigrew, both of Charleston, W. Va. (Stanley E. Dadisman, of Charleston, W. Va., on the brief), for appellant.

Arthur B. Hodges and Osman E. Swartz, both of Charleston, W.Va., for appellees.

Before PARKER and DOBIE, Circuit Judges and COLEMAN, District Judge.

PARKER, Circuit Judge.

This is an appeal in two cases involving the same questions and heard together below. The appellant, defendant below in both cases, is the United Fuel Gas Company, successor to the Warfield Natural Gas Company, with which plaintiffs, or corporations to whose rights they have succeeded, have contracts calling for the delivery of their entire production of fuel gas from certain properties. These contracts provide that the price to be paid for the gas shall be fixed by agreement at five year intervals and for arbitration in the event of the failure of the parties to agree. There was a submission to arbitration of the price to be paid for gas delivered during the five year period beginning November 1, 1945; and the arbitrators made a report which defendant gave notice ·that it would not accept but would endeavor to set aside. Plaintiffs thereupon instituted these suits asking that the awards be declared valid and enforced and that they have judgments for the amount due them to date under the terms of the award. From judgments in favor of plaintiffs (see Columbian Fuel Corp. v. Warfield Natural Gas Co., D. C., 72 F.Supp. 839 and Columbian Fuel Corp. v. United Fuel Gas Co., D.C., 72 F.Supp. 843) defendant has appealed, claiming that the court was without jurisdiction and that the awards are invalid.

Plaintiffs are producers of natural gas, one of them from leases on 83,629 acres of land scattered through nine counties in Eastern Kentucky and the other from leases on 83,587 acres scattered through ten counties in Eastern Kentucky and 362 acres in a West Virginia county. By contracts entered into in 1930 and 1931 with Warfield, they agreed to sell and Warfield agreed to purchase all of the gas that they might produce from these properties. The price to be paid was 12 cents per m.c.f. until November 1, 1932, 14 cents thereafter until November 1, 1935, and 15 cents thereafter until November 1, 1940. From November 1, 1940 to November 1, 1945, the parties agreed upon a price of 15 cents, but they were unable to reach an agreement for the five year period beginning November 1, 1945, and resorted to arbitration pursuant to one of the provisions of the contracts, which is as follows:

"On November 1, 1940 and every five years thereafter the price shall be determined by agreement or arbitration but shall not be less than fifteen (15) cents per thousand cubic feet including the gathering charge hereafter mentioned in paragraph sixth. If the parties are unable to agree upon such price, arbitrators shall be selected and shall act as provided in paragraph numbered twenty-second hereof. The decision of the majority of the arbitrators shall be final. One-half (½) of the expense of arbitration shall be borne by the buyer, and one-half (½) by the seller. The arbitrators shall base their decision upon the then reasonable *market value of gas in that territory,* delivered at gathering points adjacent to the wells as specified in this agreement and deliverable during the said period of five (5) years." (Italics supplied.)

A written submission to arbitration was signed by the parties, which provided, among other things, that the arbitrators should not be bound by strict rules of evidence and might give such weight to the evidence taken as might "seem right and proper to them". It contained the following provision, upon which defendant particularly relies in support of its position that no court has jurisdiction to pass upon the validity of the award except the Circuit Court of Kanawha County, West Virginia, viz.:

"The decision of said arbitrators, or a majority thereof, when reduced to writing in the form of an award and communicated to the parties, shall be final and binding and may, on motion of either party hereto, be entered as the judgment or decree of the Circuit Court of Kanawha County, West Virginia, and shall be enforceable as such in accordance with the provisions of Chapter 55, Article 10, of the Code of West Virginia."

When the arbitrators met to decide the question submitted to them, a controversy arose over the range of evidence to be received. The basis of the controversy was that, if the evidence was confined to the prices paid for gas in the counties named in the contracts as the situs of plaintiffs' property, these did not exceed 15 cents per m.c.f. The prices paid in these counties, however, with the exception of that paid under the contracts between plaintiffs and defendant, were, in most instances, paid to small producers who sold their gas at the well and at prices fixed, in many cases, years beforehand to continue for the life of the wells. Most of these producers had access to the lines of only one purchaser and consequently possessed no bargaining power. The total of their deliveries, moreover, was small compared with the deliveries made by plaintiffs who were delivering gas which they had gathered from a wide territory. It was contended that these sales of small producers were no fair measure of the market value which it was the duty of the arbitrators to determine and that they should take into consideration the prices paid for gas which had been gathered and delivered in quantities comparable to the deliveries of plaintiffs.

There were no such deliveries in the counties in which plaintiffs' properties lay, but there were such deliveries in adjoining counties in the same general territory. The arbitrators decided that they would receive evidence as to these deliveries. That they thoroughly understood that, in doing so, they were to consider the evidence so received for the purpose of determining the market value of gas in the territory embraced by the contract, delivered at gathering points adjacent to the wells, is shown by the following statement of Mr. Eckert, one of the arbitrators, made at the time:

"I would like to make a statement on that. Mr. Pettigrew was really quoting the paragraph from his letter that says, 'The arbitrators shall base their decision upon the then reasonable market value of the gas in the territory * * * adjacent * * *,' and so on. Of course, that paragraph doesn't say how the arbitrators shall figure this price in this territory. *The only thing we are here for is to determine the price in that territory,* but the arbitrators have quite a scope and various methods of determining the price of gas in this exact territory. For instance, what it might be worth some place else, less the cost of the transportation from this territory to that point, and many other methods of finding the value of gas in a definite territory. This doesn't say that you shall base or set the price of gas in that territory—Now, as to how it shall be done, that is up to the arbitrators, to use the different methods they may know and agree upon, to determine the value of gas at that point, * * *. *We are to determine the price at this particular place. We all know the price we are talking about, but it doesn't go on to say that this price shall be based upon any particular contracts*—maybe some are real old, maybe they are where the purchaser is very agreeable to meet his own competition, for instance; maybe three-fourths of the contracts are with him. It doesn't say how the arbitrators would arrive at this price near the wells in eastern Kentucky." (Italics supplied).

Evidence of experts was offered by plaintiffs to the effect that the reasonable market value of gas in the territory embraced by the contracts was approximately 24 cents

per m.c.f. These experts referred to contracts between the Tennessee Gas & Transmission Company and defendant, between United Producing Company and the Hope Natural Gas Company and between the United Producing Company and Atlantic Seaboard Corporation. Deliveries under these contracts were in quantities comparable to deliveries by plaintiffs and were in the same territory, although not in the counties named in the contracts as the counties in which plaintiffs' property lay. A considerable part of the testimony of the experts consisted in equalizing the conditions and deliveries of these contracts with those of the contracts between plaintiffs and defendant. After hearing all of this evidence, as well as the evidence offered by defendants as to the prices paid within the counties named in the contracts, the arbitrators, who had been selected by the parties and were themselves men of experience in the business, fixed the price to be paid under the contract at 20 cents per m.c.f.

■ The first question raised by defendant concerns the jurisdiction of the court to entertain the suit. Briefly stated, its contention is that the parties have invoked the arbitration procedure of the West Virginia statutes and the jurisdiction of the Circuit Court of Kanawha County for the settlement of their controversy and are thereby precluded from invoking the jurisdiction of the federal courts. There is nothing in this position. Aside from the fact that parties cannot by contract oust the federal courts of their statutory jurisdiction,* there is nothing in the contracts themselves which attempts to do this. The original contracts providing for arbitration made no reference whatever to the courts or statutes of West Virginia, but, on the contrary, provided that in the event of the failure of the parties to agree on a third arbitrator he should be designated by a judge of any federal court in the State of Kentucky. The submission agreements did not provide for procedure under the West Virginia statute,

but merely that after the award had been reduced to writing and signed it might, on motion of either party, be entered as a judgment or decree of the Circuit Court of Kanawha County and enforced as such in accordance with the provisions of the statute.

■■ It is argued that the provision of the submission that the award "shall be enforceable" as a judgment or decree of the Circuit Court of Kanawha County is a mandatory provision, which limits jurisdiction to that court. It will be noted, however, that the entire language is "The decision of said arbitrators, or a majority thereof, when reduced to writing in the form of an award and communicated to the parties, shall be final and binding and may, on motion of either party hereto, be entered as the judgment or decree of the Circuit Court of Kanawha County, West Virginia, and shall be enforceable as such in accordance with the provisions of chapter 55, article 10, of the Code of West Virginia." The clear meaning of this is that the entry of the award as a judgment of the court was optional, but that, if so entered, it should be accorded the status of a judgment and be enforceable as such.

It is well settled that the West Virginia statute with respect to arbitration does not provide an exclusive but an optional procedure, and that the remedies therein provided are merely supplementary to those already existing at common law or in equity. Hughes v. National Fuel Co., 121 W.Va. 392, 3 S.E.2d 621; Turner v. Stewart, 51 W. Va. 493, 41 S.E. 924. While the award of the arbitrators might have been entered of record under the provisions of the submission and section 55-10-3 of the West Virginia Code, there was, as we have seen, nothing requiring that it be so entered; and, when defendant gave notice that it intended to avail itself of all legal rights in the premises to set aside the award, there was no reason why plaintiffs should not proceed to have it declared valid and enforced by the federal courts, the requisite

* Ins. Co. v. Morse, 20 Wall. 445, 458, 22 L.Ed. 365; Guaranty Trust Co. v. Green Cove Railroad, 139 U.S. 137, 143, 114 S.Ct. 512, 35 L.Ed. 116; United States v. Leahy, 3 Cir., 148 F.2d 462, 467; Nashua River Paper Co. v. Hammermill Paper Co., 223 Mass. 8, 111 N. E. 678, L.R.A.1916D 691; 14 Am.Jur. 389.

elements of federal jurisdiction being present.

■■ It is argued that there is no jurisdiction in equity to enforce the award; but, even if correct, this would not justify a dismissal of the suits. An actual controversy existed as to the validity of the award and the rights of the parties thereunder; and this was unquestionably sufficient to give the court jurisdiction to enter a declaratory judgment as to its validity and afford to the parties any further relief appropriate in the premises. 28 U.S.C.A. § 400; Lehigh Coal & Navigation Co. v. Central R. Co. of New Jersey, D.C., 33 F. Supp. 362, 366; Texoma Natural Gas Co. v. Oil Workers International Union etc., D.C., 58 F.Supp. 132, 150. There can be no question, however, as to the jurisdiction in equity. Specific performance to enforce an award is granted on the same principles that apply to enforcement of contracts. Pomeroy, Equitable Remedies, 2d ed. sec. 754, 3 Am.Jur. 981. The matter involved here is not merely the right to recover the difference in price under the award with respect to gas already delivered, but the right to require defendant, for the remainder of the five year period. to take and pay for all the gas produced from the properties in question at the price fixed. Since plaintiffs have made large expenditures for the purpose of collecting the gas and delivering it to defendant, by way of laying pipe lines, etc., and have placed themselves. in a position where they would suffer irreparable damage if defendant should fail to carry out the contracts, there would seem to be no reason why equity should not afford them protection. The jurisdiction to decree specific performance or otherwise protect in equity rights under contracts relating to the sale of gas and oil is well established where an award of damages will not afford adequate relief. Hall v. Philadelphia Co., 72 W. Va. 573, 78 S.E. 755; Southwest Pipe Line Co. v. Empire Natural Gas Co., 8 Cir., 33 F.2d 248, 249; Texas Co. v. Central Fuel Oil Co., 8 Cir., 194 F. 1; Griffin v. Oklahoma Natural Gas Corp., 10 Cir., 37 F.2d 545, 550.

■■ And we think that the attack on the award of the arbitrators is as lacking in merit as the attack on the court's jurisdiction. It was the duty of the arbitrators, as they clearly understood, to determine the market value of gas in the territory in which were located the wells from which plaintiffs' supply of gas was gathered; but nothing in the contracts required that they be limited in the taking of evidence or in the determination made thereon to the counties named in the contract as describing the location of the lands upon which the wells were situate. The arbitrators were to decide what was "the reasonable market value of gas in that territory"; but this language manifestly had reference to territory delimited by trade conditions, not by the boundaries of political subdivisions, and it was competent for the arbitrators to hear evidence of anything tending to establish market value in the territory so considered. Prices paid in adjoining counties for gas delivered in quantities comparable to those delivered by plaintiffs would certainly appear to be a better criterion of market value in the territory than prices paid within the counties themselves to individual well owners who delivered only small quantities of gas, were denied the benefit of effective competition and had to take what they could get for their product.

When the contracts were made in 1930 and 1931, plaintiffs were gathering and had under their control a large volume of the gas produced within the territory. In contracting for its sale over an indefinite future, it was impossible to foresee the trend of costs and prices; and provision for arbitration was accordingly made. In providing that the arbitrators should determine reasonable market value within the territory, the parties must have intended that their language be given the reasonable meaning that the law gives it, viz., the price that a willing purchaser would be willing to pay a willing seller for gas delivered in comparable quantities and under like conditions; and it is perfectly clear that it was proper for the arbitrators to give consideration to prices paid on comparable deliveries within the same general territory. Defendant bases an argument on the provision of the contract that the gas was to be "delivered at gathering points adjacent to the wells"; but this was merely a specification

of the sort of delivery upon which market value was to be based, not a limitation of territory to be considered in computing market value.

■■■■ There is no allegation of fraud or corruption on the part of the arbitrators; and for the reasons stated we think it clear that they did not transcend their powers. It was their duty under the submission to determine reasonable market value within the territory; and this they purported to do and this we understand that they did do: We think it clear, as found by the court below, that they considered the "adjoining counties" merely for the purpose of determining the scope of the evidence; but if they had considered them as a part of the territory to be taken into account in determining market value for "that territory", this would not have been an improper interpretation, if the adjoining counties constituted a part of the same territory for trade purposes. We cannot say that the arbitrators misinterpreted the contract or that they considered improper evidence in making their award; but, had they done so, this would not vitiate the award. Burchell v. Marsh, 17 How. 344, 15 L.Ed. 96; Underhill v. Van Courtlandt, 2 John Ch., N.Y., 339; Boomer Coal & Coke Co. v. Osenton, 101 W.Va. 683, 133 S.E. 381; Brodhead Garrett Co. v. Lumber Co., 97 W.Va. 165, 124 S.E. 600. As said in Burchell v. Marsh, supra:

"Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes, it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of judges chosen by the parties, and would make an award the commencement, not the end, of litigation."

The rule applicable is well stated by the Supreme Court of Appeals of West Virginia in Boomer Coal & Coke Co. v. Osenton [101 W.Va. 683, 133 S.E. 385], supra, as follows:

"The strict rules governing an action at law are not applicable to a proceeding of this nature. An arbitration, while it partakes of the nature of a quasi judicial proceeding, it is not such a proceeding in a technical sense. It is a domestic tribunal as distinguished from a regular organized court. The very existence of the tribunal depends upon the voluntary actions of the disputants. They select their own judges. Its object and aim is to arrive at a just determination of the matters in dispute, and finally dispose of the same in a speedy and inexpensive way. The arbitrators are usually laymen, inexperienced in the technical rules of law, selected because of their intelligence and integrity, and with the belief that they will do substantial justice between the parties. To require an arbitrator to follow the fixed rules of law in arriving at his award would operate to defeat the object of the proceeding. The courts of this country have adhered with great steadiness to the general rule that awards will not be set aside for errors of law or fact on the part of the arbitrators. 2 R. C.L. 386. Their decision on matters of fact and law is conclusive, and all matters in the award are thenceforth res judicata, on the theory that the matter has been adjudged by a tribunal which the parties have agreed to make final, a tribunal of last resort for that controversy. Chapline v. Overseers, Va., 7 Leigh 231, 30 Am.Dec. 504; Curley v. Dean, 4 Conn. 259, 10 Am. Dec. 140; Stose v. Heissler, 120 Ill. 433, 11 N.E. 161, 60 Am.Rep. 563; Roberts v. Consumers' Can Co., 102 Md. 362, 62 A. 585, 111 Am.St.Rep. 377; Chandos v. Insurance Co. 84 Wis. 184, 54 N.W. 390, 19 L.R.A. 321."

There was no error and the judgments appealed from will be affirmed.

Affirmed.